## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 8:24-cr-77-VMC-NHA

LEWIS JAMES SCOTT

_____

### REPORT AND RECOMMENDATION THAT THE
### COURT PARTIALLY GRANT AND PARTIALLY DENY
### THE DEFENDANT'S MOTION TO SUPPRESS

Defendant Lewis James Scott moves to suppress evidence that law enforcement officers recovered following the September 4, 2023 traffic stop of a car he was driving. Doc. 20. Specifically, he seeks to suppress the firearm and narcotics that law enforcement found while searching the car and any statements he made during the stop. *Id.*  Having reviewed the motion (Doc. 20), the United States' response (Doc. 27), and the Defendant's reply (Doc. 28), and having had the benefit of an evidentiary hearing (*see* Doc. 46), I respectfully recommend that the Court partially grant and partially deny the motion.

1

## I.     Procedural History

On February 27, 2024, based on evidence recovered during a September 4, 2023 traffic stop, a federal grand jury returned an indictment charging the Defendant with possessing methamphetamine with the intent to distribute it (Count One), possessing a firearm in furtherance of a drug trafficking offense (Count Two), and possessing a firearm after having been convicted of a felony (Count Three). Doc. 1.

The Defendant first appeared on these charges on March 15, 2024. Doc. 10. He filed the present motion to suppress on May 10, 2024. Doc. 20. The United States responded to the motion to suppress on May 31, 2024 (Doc. 27), and the Defendant, without leave of court,[1] filed a reply on June 6, 2024 (Doc. 28). After granting multiple unopposed motions to continue and reschedule the hearing (*see* Docs. 29, 35, 41), the Court held a hearing on the motion on July 30, 2024 (*see* Doc. 46).

At the hearing, the United States presented three witnesses: Deputy Robert Cote, Deputy Jared Curtis, and Deputy Reed Service. Doc. 44. The United States admitted without objection seven exhibits: two photographs (Exs. 1 and 2), three body camera videos (Exs. 3, 6, and 7), and two narcotics

---

[1] *See* Local Rule 3.01(d) (establishing that no party has the right to file a reply without leave of court).

field test reports (Exs. 4 and 5). *See* Docs. 43, 47. The Defendant presented no exhibit or witness.

## II.   Background

As confirmed on the record at the hearing, the parties do not dispute the following facts:

On September 4, 2023, Hillsborough County Sheriff's Deputies pulled over a rental car that the Defendant was driving. Doc. 20, pp. 1–2. The renter of the vehicle, Marissa Brimlow, was sitting in the front passenger seat. *Id.;* Doc. 27, pp. 3–4. Deputy Service stopped the vehicle after Deputy Cote asserted that he had watched it improperly change lanes and noticed that one of its tag lights was broken.  Doc. 20, pp. 1–2; Doc. 27, pp. 4–5; *see* Ex. 3 at 3:25-4:35 (explaining basis for the stop).

During the stop, the vehicle remained readily mobile.

At some point during the stop, the Defendant questioned at least one of the Deputy's directions. *See* Doc. 20, p. 2; Doc. 27, p. 2. Shortly thereafter, the Deputy ordered the Defendant out of the vehicle and handcuffed him. Doc. 20, p. 2–3.  Later, the Defendant was placed in the back of a deputy's truck. Ms. Brimlow was also ordered to exit the vehicle. *Id.*, p. 3.

Once the Defendant was placed in handcuffs, he was in custody and not free to leave.

While the Defendant was in handcuffs, the deputies asked him how long he had been driving the rental vehicle, who the rightful renter was, whether there were drugs, contraband, or firearms inside the vehicle, the identity of a white powder inside the vehicle, and, later, whether they would find anything in the seat where the Defendant had been sitting in the deputy's truck. *See* Ex. 3 at 3:15-4:55; *Id.* at 5:34-6:25; Ex. 6 at 14:15-14:35. During the stop, the Defendant also made various comments without prompting. *See, e.g.,* Ex. 6 at 13:15-15:28 (Defendant denying ownership of the car and anything in, it in response to Dep. Service's asking "are you alright?" and directing his movements in and out of the deputy's truck). The Defendant had not yet been given his *Miranda* warnings when these exchanges occurred. *Id.*

Deputy Curtis searched the passenger's side of the vehicle, citing as his basis the alleged furtive movements of Ms. Brimlow as he approached the truck, and the occupants' hesitancy to roll down her window when asked. *See* Testimony of Dep. Curtis (discussing Ms. Brimlow bending forward and reaching underneath her seat for an extended period upon the deputy's approach); *but see* Ex. 7 at 1:43; Ex. 7 at 1:25-2:00; Ex. 6 at 1:06-1:55.[2]

---

[2] I do not examine whether Deputy Curtis's initial search of the passenger's compartment was supported by probable cause, because (1) the Defendant does not appear to expressly challenge this aspect of the search in

While Deputy Curtis was searching the passenger's side of the vehicle, Deputy Cote field tested powder found in the driver's side door handle pocket, which field tested positive for cocaine and methamphetamine. *See* Ex. 3 at 11:41 and 12:27; Ex. 4 (presumptive field test report for cocaine); Ex. 5 (presumptive field test report for methamphetamine).

The Deputies then searched the entirety of the vehicle and found a digital scale, substances they suspected to be cocaine, methamphetamine, and ketamine, and a .380 caliber Smith and Wesson. Doc. 27, p. 3.

Later, the Defendant was given his *Miranda* rights and interviewed by the deputies. *Id.*, p. 8.

The parties dispute, as explained further below, facts related to the bases for the traffic stop, the pre-Miranda questioning of the Defendant, and the search of the vehicle. *See* Docs. 20, 27.

---

his motion, *see* Doc. 20; (2) the United States does not rely on the fruits of the initial search as its basis for probable cause to later search the entire vehicle, and (3) I find by a preponderance of the evidence that the United States would have lawfully searched the entire vehicle notwithstanding anything recovered in the initial passenger-side search, based on the independently developed probable cause discussed further below. Thus, anything found in the passenger's compartment would have inevitably been discovered by lawful means and is therefore admissible. *See Nix v. Williams*, 467 U.S. 431, 444 (1984).

## III.   Analysis

The Defendant argues that the deputies violated the law when they:
(1) stopped the Defendant's vehicle without a lawful basis, (2) questioned the
Defendant without advising him of his Fifth Amendment rights, and
(3) searched his car without probable cause to believe it contained evidence of
a crime. Doc. 20.

A. Authority for the Traffic Stop

### 1.   Arguments

The Defendant asserts that the deputies' stated bases for the traffic
stop—the improper lane change and the broken tag light—were legally
insufficient and factually false.  Because law enforcement lacked a lawful
basis for the traffic stop, the Defendant argues, the stop was illegal and all
evidence derived from it should be suppressed.

### a.  Lane Change

Deputy Cote testified that the deputies stopped the Defendant's
vehicle, in part, because the Defendant changed lanes over a solid line as he
was approaching an intersection. Doc. 20, p. 4; *See* Testimony of Deputy Cote.
The Defendant suggests this is false. Doc. 20, p. 4. The Defendant, citing a
Google Earth image, states that this would be impossible, because the
Eastbound lane of Madison Avenue, in which the Defendant was traveling,
comprises a single lane before breaking out into turning lanes. *Id.*

The United States argues that the Defendant changed lanes, crossing a solid line, within 100 feet of an intersection and that this violated Florida Statutes, section 316.087. Doc. 27, p. 2.

### b.  License Tag Light

A second reason Deputy Cote gave for stopping the Defendant's vehicle was that one of the tag lights was broken, making the tag illegible from more than 10 feet away. *See* Doc. 20, p. 2; Testimony of Deputy Cote. The Defendant asserts that law enforcement lacked authority to pull the Defendant over on this basis, because "the law in Florida turns on visibility, and not whether one of two tag lights are dim." *Id.* p. 4.

The United States responds that Florida law requires a vehicle's tag light to make its license plate legible from 50 feet away. Doc. 27, p. 5. Because the Defendant's tag was not legible until the officers were 10 feet away, the United States argues, the Defendant's operation of the vehicle constituted a traffic infraction. *Id.*, pp. 2, 5. The United States argues that this infraction constitutes a separate and independent basis on which the deputies were authorized to pull the Defendant over.  *Id.*, pp. 4–5.

### 2. *Findings of Fact and Conclusions of Law*

A police officer may stop a vehicle based on probable cause to believe the driver has committed a traffic violation. *Delaware v. Prouse,* 440 U.S. 648, 663 (1979); *see, e.g., Pennsylvania v. Mimms,* 434 U.S. 106, 109 (1977)

(per curiam) (when an officer observes a violation of traffic law, "there is no question about the propriety of the initial restrictions" imposed by a traffic stop).

The United States alleges that the deputies were authorized to stop the Defendant, because he changed lanes within 100 feet of an intersection. Doc. 27, pp. 2, 4. For the proposition that such a lane change is unlawful, the United States cites Florida Statutes, section 316.087, which provides, in relevant part:

> (1) No vehicle shall at any time be driven to the left side of the roadway under the following conditions:
>
> (c) When approaching within 100 feet of or traversing any intersection, except that this section shall not apply to any intersection on a state-maintained or county-maintained highway located outside city limits unless such intersection is marked by an official Department of Transportation or county road department traffic control device indicating an intersection either by symbol or by words and such marking is placed at least 100 feet before the intersection;
>
> (3) A violation of this section is a noncriminal traffic infraction, punishable as a moving violation as provided in chapter 318.

See Doc. 27, p. 2.

This statute appears inapplicable to the alleged infraction. However, I need not determine whether the lane change supported the traffic stop, because the United States offers the additional and independent justification for stopping the Defendant that the Defendant's tag light was too dim for the

deputies to read his license plate from more than 10 feet away. Doc. 27, p. 2;

*see* Testimony of Dep. Cote.

Florida Statutes section 316.221 states:

(2) Either a taillamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. Any taillamp or taillamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlamps or auxiliary driving lamps are lighted. Dump trucks and vehicles having dump bodies are exempt from the requirements of this subsection.

(3) A violation of this section is a noncriminal traffic infraction, punishable as a nonmoving violation as provided in chapter 318.

I credit Deputy Cote's uncontradicted testimony that the Defendant's

tag was not visible from more than 10 feet away, because one of his tag lights

was broken. *See* Testimony of Dep. Cote; *see also* Ex. 3 at 3:25-4:35

(explaining basis for the stop).

Because I find by a preponderance of the evidence that the Defendant's

tag light was not sufficiently bright to render his license tag legible from 50

feet away, I conclude that the deputies had a lawful basis to stop the

Defendant's vehicle.

B. Questioning of the Defendant

1. *Arguments*

The Defendant next argues that, while he was in handcuffs, deputies asked him potentially incriminating questions. Doc. 20, p. 5. The Defendant asserts that this questioning violated his Fifth Amendment rights, because it constituted custodial interrogation and deputies did not first advise him of his right against self-incrimination. *Id.*, pp. 5-7.

The United States argues that, before deputies gave him any *Miranda* warnings, it was the Defendant, not the deputies, who asked most of the questions. Doc. 27, p. 8. Further any questions the deputies did ask—such as how long the Defendant had driven the car, who the rightful renter was, whether there was contraband in the car, and what the white powder on the door was (*see* Ex. 3 at 3:15-4:55; *Id.* at 5:34-6:25)—were permissible under the public safety exception to the Fifth Amendment. *Id.*, pp. 8–9. The government adds that the deputies did administer *Miranda* warnings later in the stop and that the statements that followed those warnings were clearly admissible. *Id.*, p. 8.

2. *Findings of Fact and Conclusions of Law*

"[C]ustodial interrogation generally cannot occur before a suspect is informed of his *Miranda* rights." *United States v. Ochoa*, 941 F.3d 1074, 1096 (11th Cir. 2019), *cert. denied,* 140 S. Ct. 2553 (2020) (citing *New York v.*

*Quarles*, 467 U.S. 649, 654 (1984)). However, the public-safety exception permits pre-*Miranda* questioning when officers ask, "questions necessary to secure their own safety or the safety of the public," as opposed to, "questions designed solely to elicit testimonial evidence from a suspect." *Quarles,* 467 U.S. at 658–59. "Although the name to the exception implies that it is only available when officers are concerned for the general public, '[t]he exception to *Miranda* also applies where there is a threat to the officers rather than the public.'" *United States v. Williams*, 784 F. App'x 707, 709 (11th Cir. 2019) (quoting *United States v. Newsome*, 475 F.3d 1221, 1224–25 (11th Cir. 2007)).

The public-safety exception was designed to avoid forcing officers to decide, quickly and amid volatile situations, whether to subordinate safety and security to the preservation of admissible evidence. *Ochoa*, 941 F.3d at 1097. The availability of the public-safety exception "does not depend upon the motivation of the individual officers involved." *Quarles*, 467 U.S.  at 650. In fashioning the exception, the Supreme Court recognized that an officer might act out of "different, instinctive, and largely unverifiable motives— their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." *Id.* The Court explained, "the application of the [public safety] exception . . . should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer." *Id.*

11

Thus, where there is an objectively reasonable concern for officer safety, an officer may use broad phrasing to inquire about potential hazards on the scene. *See Ochoa*, 941 F.3d at 1097 ("[T]he officer's 'broad phrasing'— i.e., his query about 'anything' he needed to know about—was not problematic, despite the risk that his question might have elicited information not pertinent to the officers' safety." (citation omitted)).

For example, the Eleventh Circuit has affirmed the pre-*Miranda* questioning of detainees during a traffic stop, after the officer spotted objects he suspected could be explosive devices. *United States v. Spoerke*, 568 F.3d 1236, 1241 (11th Cir. 2009). The officer asked the suspects what the devices were and how they were made. *Id.* The Eleventh Circuit held that the defendant's responses to those questions were admissible under the public safety exception, because the officer's "questions were designed to discern the threat the bombs presented to the officer and the nearby public." *Id.* at 1249.

Further, the Eleventh Circuit has also upheld the pre-*Miranda* questioning of a suspect while he was being secured inside a motel room, even though it did not appear in that moment that any guns or additional persons were present. *United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007). Because the officers suspected an additional person might be present, and because they thought the defendant might have a weapon in the room, they were permitted to ask, "Is there anything or anyone in the room

12

that I should know about?" *Id.* They were also permitted to "follow[] up to

pinpoint the exact location of the gun." *Id.*

Here, the Defendant challenges the deputies' right to ask him certain

questions, but does not expressly identify which of the Defendant's

statements he seeks to suppress. *See* Doc. 20, pp. 5–7. Nor does the United

States yet know which of his statements it intends to offer at trial. *See*

Statements by S. Newman in Hg. Transcript. Thus, the motion as to Mr.

Scott's statements may be moot. However, having considered the parties'

briefing, the videos of the stop, and the deputies' testimony, I make the

following findings:

a. Unelicited Statements

The Defendant made certain unprovoked statements during the stop.

*See, e.g.,* Ex. 6 at 13:15-15:28 (Defendant denying ownership of the car and

anything in, it in response to Dep. Service's asking "are you alright?" and

directing his movements in and out of the deputies' truck). Those statements

are not the result of any interrogation and are, therefore, admissible. *See*

*Pennsylvania v. Muniz*, 496 U.S. 582, 604-605 (1990) ("incriminating

utterances [in response to procedural instructions] were 'voluntary' in the

sense that they were not elicited in response to custodial interrogation.").

13

b. Statements in Response to Non-Safety Questions

Some of the Defendant's statements were elicited by questions that were not supported by the public safety exception. No party disputes that, when the stop was first initiated, the deputies were entitled to ask the Defendant about his right to possess the vehicle. However, once the Defendant was removed from the vehicle and handcuffed—at which point the deputies had not yet seen any controlled substances and at which point both parties agree the Defendant was in custody—the deputies asked the Defendant: (1) how long he had had the vehicle, to which the Defendant responded "I just got it three days ago," (Ex. 3 at 4:35–4:42), and (2) about the person listed on the rental agreement ("Tyrisha") (Ex. 3 at 6:00–6:30). In support of these questions, the United States offers, "those questions are subject to the 'public safety exception' . . . in light of Scott's strange behavior at the scene." Doc. 27, p. 9. The government offers no other legal or factual support of the questions.

With no proffered explanation by the United States linking the questions to any safety concern, I do not find that questions about "how long [the Defendant had] had this vehicle" or the identity of the listed renter constitute inquiries about potential hazards related to any objectively reasonable concern for officer safety. *See* Doc. 27, p. 9. I therefore recommend that the Defendant's response to these questions be suppressed.

14

### c. Statements Responsive to Safety Questions

Some of the Defendant's statements were elicited by questions permissible under the public safety exception. Specifically, I find that, after the discovery of the powder in the Defendant's door handle pocket, there was an objectively reasonable concern for officer safety, based on the Defendant's intermittently hostile behavior toward the deputies and the presence of a substance consistent with narcotics, including, potentially, fentanyl (*see* Testimony of Dep. Cote). This concern justified asking the Defendant about the identity of the powder (*see* Ex. 3 at 5:34-5:55) and about whether the officers might find anything where the Defendant had been sitting in the deputies' vehicle (*see* Ex. 6, at 14:15-14:35).

As to the Defendant's denial in response to the deputies' earlier inquiries about contraband and in the rental car (*see* Ex. 3 at 4:47-4:55), the United States noted that the denial benefitted only the Defendant. *See* Statements by AUSA S. Newman. Thus, it did not appear that the United States intended to offer the statement at trial, except out of fairness to the Defendant. Nor does it seem clear that the Defendant wishes to exclude his response. I therefore find the question of whether the Defendant's earlier general denial of contraband should be suppressed to be moot.

C.  Searching the Vehicle

    *1.  Arguments*

Finally, the Defendant argues that law enforcement lacked probable cause to search his vehicle after he and his passenger were removed from it. Doc. 20, p. 8. He suggests that the officers did not find their basis for probable cause (specifically the white powder on the driver's side door) in plain view, but only after moving a lighter and using flashlights. *See id.*

The United States first asserts that the Defendant failed to demonstrate his reasonable expectation of privacy in the car, given that he was not the lawful renter. Doc. 27, p. 9. Thus, the United States argues, the Defendant lacks standing to contest the search. *Id.*

The United States then argues that, even if the Defendant had standing to contest the search, his challenge would lack merit. *Id.*, pp. 7, 9. The Defendant left the car door open when he exited the vehicle, and the Deputies saw on the driver's side door, in plain view, white powder that was consistent with (and field tested positive for) narcotics. Doc. 27, pp. 3, 7; Exs. 4, 5. That, combined with the Defendant's combativeness, his reluctance to roll down the passenger's side window, his resistance to the deputies' commands, and his passenger's furtive movements, established probable cause for the search. *Id.*, p. 3.

16

2.    *Findings of Fact and Conclusions of Law*

a.  Standing to Contest the Search

The United States challenges the Defendant's standing to contest the search of the car, arguing that the Defendant failed to demonstrate his lawful possession of the vehicle. Doc. 27, p. 9.

"[T]he mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." *Byrd v. United States*, 584 U.S. 395, 411 (2018). In *Cohen*, the Eleventh Circuit held that someone other than the renter, who was driving a rental car with the permission of the person who rented it, had standing to contest a search of that car, even though he had contraband in the vehicle, and even though he was unlicensed thereby making his operation of the vehicle inherently unlawful. *United States v. Cohen*, 38 F.4th 1364, 1367–69 (11th Cir. 2022). In so holding, the Eleventh Circuit noted that Cohen did not use subterfuge or interfere with anyone's possessory rights when he took possession of the vehicle. *Id.* at 1369. And he still had the right to exclude third parties, such as carjackers from the vehicle. *Id.* This was sufficient to give him a reasonable expectation of privacy in the vehicle. *Id.*

Here, there is no dispute that the lawful renter of the vehicle—Ms. Brimlow, the front seat passenger—permitted the Defendant to drive the

vehicle. There is no suggestion that the Defendant used subterfuge to take possession of the vehicle or that he otherwise interfered with anyone's property rights in doing so. He therefore had a reasonable expectation of privacy in the vehicle and has standing to contest the search.

b.  Probable Cause for the Search

If a traffic stop is legal, the officers involved in the stop may "conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, and running a computer check for outstanding warrants." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). The officers may also, as a matter of course, order the occupants of a lawfully stopped vehicle to get out. *Spoerke*, 568 F.3d at 1248.

Additionally, the officers may take measures to ensure their personal safety. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). In addressing their safety concerns, and as a matter of routine, officers may look through a vehicle's windows at the interior of the vehicle. Indeed, a driver has no reasonable expectation of privacy in the portion of a vehicle's interior that is visible from the outside. *Texas v. Brown,* 460 U.S. 730, 740 (1983). Officers may even "use a flash light to illuminate a vehicle's dark interior." *United States v. Purcell,* 236 F.3d 1274, 1277-78 (11th Cir. 2001), *cert. denied*, 534 U.S. 830 (2001). Should these routine procedures yield concerns, a police

18

officer "ha[s] the duty to investigate suspicious circumstances that [come] to his attention." *Simmons*, 172 F.3d at 779 (citation omitted). And if the procedures yield probable cause to search the vehicle, the officers may do so.

Officers have probable cause to search a vehicle "when the facts and circumstances would lead a reasonable prudent [person] to believe the vehicle contains contraband." *United States v. Forker*, 928 F.2d 365, 368 (11th Cir. 1991) (citation and internal quotation omitted). Law enforcement does not need a warrant to conduct the search, so long as the car is readily mobile. *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006); *United States v. Watts*, 329 F.3d 1282, 1285 (11th Cir. 2003). Further, if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every container therein, even without a warrant, even if there is no probable cause linked to that container. *Arizona v. Gant*, 556 U.S. 332, 346-347 (2009); *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999); *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014).

Here, because they conducted a lawful traffic stop, the deputies were entitled to direct the Defendant and his passenger to get out of the car, and they were entitled to look at the visible portions of the car's interior, including with the aid of flashlights. Deputy Cote's bodycam video (Ex. 3) shows that the Defendant left his door open when he was lawfully ordered to

exit the vehicle. *See* Ex. 3 at 2:00. This revealed a white powdery substance. *See* Ex. 3 at 5:35-5:45. (*See* Dep. Cote's Testimony).

I credit Deputy Cote's testimony that the substance was consistent, in his experience, with narcotics. Indeed, the field tests confirmed his suspicion. *See* Ex. 3 at 10:30-11:40 and 11:55-12:45 (showing Dep. Cote conducting field tests); Ex. 4 (field test report), Ex. 5 (field test report). I also credit Deputy Cote's testimony that the Defendant's resistance to the deputies' directions and hostile behavior—at some points during the stop—were consistent, in his training and experience, with the behavior of persons who were concerned about contraband being recovered within the vehicle. I find that these facts together gave deputies probable cause to believe that a search of the vehicle would yield evidence of a crime. As no one contests that the vehicle was readily mobile, officers needed nothing further to authorize their search of the vehicle.

## IV.   Conclusion

A.      <u>I respectfully recommend that the Defendant's Motion to Suppress be DENIED with respect to contraband discovered in the vehicle.</u>

Because the Defendant committed a traffic infraction by driving a car with a poorly lit license plate, the deputies were authorized to pull his car over. While the car was pulled over, the deputies had the right to order the Defendant out of the vehicle and to examine the visible portion of the

vehicle's interior. The presence of narcotics in plain view, along with the Defendant's behavior during the stop, created probable cause to believe that the vehicle contained evidence of a crime. Thus, the search of the car was lawful, and the evidence recovered from it should not be suppressed.

B. <u>I respectfully recommend that the Defendant's Motion to Suppress be DENIED with respect to the Defendant's unprompted statements.</u>

Statements unprompted by interrogation are not unlawfully obtained. Here, the Defendant offered such statements about the possession of the vehicle and its contents, either without prompting, or in response to the officers' entirely unrelated questions or statements. *See, e.g.,* Ex. 6 at 13:15-15:28 (Defendant denying ownership of the car and anything in, it in response to Dep. Service's asking "are you alright?" and directing his movements in and out of the deputies' truck). These statements were not unlawfully elicited and need not be suppressed.

C. <u>I respectfully recommend that the Defendant's Motion to Suppress be DENIED with respect to the Defendant's responses to safety questions.</u>

After discovering in plain view powder consistent with narcotics—including, potentially, fentanyl—there was an objectively reasonable concern for officer safety in searching the vehicle. The deputies were, therefore, authorized to ask the Defendant about the identity of the substance (*see* Ex. 3 at 5:34-5:55) and whether they would find anything else

in the portion of the deputies' vehicle where the Defendant had been seated during the stop (*see* Ex. 6, at 14:15-14:35). Although it is unclear whether the Defendant seeks to exclude responses to these questions, or whether the government seeks to offer them, I respectfully recommend that the Defendant's responses to these questions not be suppressed.

      D.      <u>I respectfully recommend that the Defendant's Motion to Suppress be GRANTED with respect to certain responses to questions about the vehicle and its listed renter.</u>

The United States offers only a public-safety argument to support the deputies' custodial questions about (1) how long the Defendant had had the rental car (Ex. 3 at 4:35-4:42), and (2) the identity of the person listed on the rental agreement ("Tyrisha") (Ex. 3 at 6:00-6:30). *See* Doc. 27, p. 9. Because the United States does not demonstrate (or even offer) a connection between these questions and the officers' safety, I find that these questions fall outside of the public safety exception. I recommend that Defendant's answers to these questions be suppressed.

In short, I respectfully recommend that the Court GRANT the Defendant's Motion to Suppress (Doc. 20), to the extent it seeks to suppress his responses to custodial questions about the duration of his possession of the vehicle and his knowledge of the listed renter (Ex. 3 at 4:35-4:42; 6:00-

6:30), and otherwise DENY the motion.

SUBMITTED to the District Court on August 5, 2024.

NATALIE HIRT ADAMS
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. To expedite resolution, parties may file a joint notice waiving the 14-day objection period.